IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

KRIS HUFFAKER,                        )
                                      )
                  Plaintiff,          )
                                      )
        v.                            )        Case No.
                                      )        11-3490-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
                  Defendant.          )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kris Huffaker seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) not giving controlling weight to the opinion of Dr. Mitchell Ahrens, plaintiff's treating physician; (2) in failing to properly assess plaintiff's credibility; and (3) in not including all relevant limitations in plaintiff's residual functional capacity. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On June 22, 2010, plaintiff applied for disability benefits alleging that he had been disabled since March 15, 2010. Plaintiff's disability stems from fibrosing mediastinitis,[1] diabetes mellitus, and a shoulder impairment. Plaintiff's application was denied on October 8, 2010. On July 14, 2011, a hearing was held before an Administrative Law Judge. On August 15, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On

---

[1]A rare disorder caused by proliferations of collagen, fibrosis tissue and associated inflammatory cells within the mediastinum (the space between the lungs).

October 12, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

    No = not disabled.
    Yes = go to next step where burden shifts to Commissioner.

3

5.      Does the impairment prevent the claimant from doing any other work?

                Yes = disabled.
                No = not disabled.

## IV.    THE RECORD

The record consists of plaintiff's testimony and documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

| Date | Earnings | Indexed Earnings |
|------|----------|------------------|
| 1992 | $ 6350.81 | $ 11,445.64 |
| 1993 | 420.50 | 751.38 |
| 1994 | 6,071.84 | 10,565.98 |
| 1995 | 6,986.20 | 11,688.59 |
| 1996 | 4,209.88 | 6,715.13 |
| 1997 | 9,647.14 | 14,539.64 |
| 1998 | 21,811.28 | 31,237.82 |
| 1999 | 15,617.42 | 21,186.38 |
| 2000 | 4,123.42 | 5,300.65 |
| 2001 | 23,399.70 | 29,379.39 |
| 2002 | 29,469.62 | 36,633.06 |
| 2003 | 0.00 | 0.00 |
| 2004 | 87,900.00 | 101,921.22 |
| 2005 | 9.00 | 10.07 |
| 2006 | 14,537.74 | 15,547.09 |
| 2007 | 31,177.14 | 31,894.34 |
| 2008 | 32,943.78 | 32,943.78 |
| 2009 | 18,992.50 | 18,992.50 |

4

|      |          |          |
|------|----------|----------|
| 2010 | 1,905.83 | 1,905.83 |
| 2011 | 0.00     | 0.00     |

(Tr. at 129-130, 134, 148-149).

### Disability Report - Adult

In an undated Disability Report, plaintiff reported that he stopped working on January 25, 2010 (Tr. at 153-160). When asked why he stopped working, he wrote, "Because of other reasons." When asked to explain, he wrote, "I had an abcess [sic] in my groin area and had to have minor surgery." He then reported that his condition became severe enough to keep him from working as of March 15, 2010, his alleged onset date.

### Function Report

In a Function Reported dated June 26, 2010, plaintiff reported that he lives in an apartment with his brother (Tr. at 164-171). He described his day as follows:

> I wake up fix something simple to eat and watch movies and TV. Then fix lunch. After that I will watch more TV maybe some video games, fix or eat supper, then more TV. Most days I have to sleep at some point during the day as well as at night.

Plaintiff has no difficulty dressing himself, caring for his hair, shaving or using the toilet. Bathing "winds" him sometimes. Feeding himself "winds" him depending on the "prep time". Plaintiff prepares his own meals, which consist of sandwiches and sometimes "small self-prepared meals." It takes him five to 30 minutes to prepare his meals. Plaintiff does laundry once a week for one to two hours. He goes outside once or twice a day on good days. He can walk and ride in a car. He is able to go out alone; he is able to drive. He shops in stores for food and hygiene products for an hour or two at a time.

Plaintiff's impairments affect his ability to lift, squat, bend, stand, walk, kneel, talk, climb stairs and complete tasks. These things take the wind out of him in a very short period of time. He has no difficulty with reaching, sitting, hearing, seeing, remembering, concentrating,

understanding, following instructions, using his hands, or getting along with others. Plaintiff can walk 1/2 block or 100 yards before needing to rest for a few minutes. He can pay attention for any amount of time. He finishes what he starts, and he can follow instructions "pretty well." Plaintiff has lost a job in the past due to problems getting along with others: "There was an issue of how to due [sic] the job safely."

**Missouri Supplemental Questionnaire**

In a Missouri Supplemental Questionnaire dated June 26, 2010, plaintiff reported that he is able to play video games or use a computer for up to two hours at a time, he has a valid driver's license, and he is able to drive (Tr. at 173).

**B.      SUMMARY OF MEDICAL RECORDS**

On December 22, 2009, plaintiff saw Thomas J. Legg, D.O., at Seymour Family Health Care for evaluation of an abscess in the left groin area (Tr. at 281-282). Plaintiff reported that his blood sugar was running in the 300s but he was not taking his diabetes medication as prescribed. He also reported some dizziness, but did not mention problems with a cough. Dr. Legg noted that plaintiff's chest was clear, and his heart rate and rhythm were regular. Dr. Legg prescribed an antibiotic for the abscess and diabetes medication.

Plaintiff saw Dr. Legg on January 19, 2010, for an evaluation of his diabetes mellitus and a recheck of his abscess (Tr. at 278). Plaintiff weighed 309 pounds and reported that his blood sugar had been running from 250 to 350 in the morning and at supper. Plaintiff's blood was tested and his glucose was 171 (normal is 70 to 100) (Tr. at 276). His A1c[2] was 12.0. Dr. Legg indicated he may consider increasing plaintiff's diabetes medication.

_____

[2]An A1c test measures average glucose for the past two to three months. An A1c of 12.0 means the average blood sugar level for the past two to three months was 345.

6

The next month, on February 2, 2010, plaintiff saw Dr. Legg for a follow up on diabetes (Tr. at 274). Plaintiff was not taking his Lisinopril,[3] and Dr. Legg noted that plaintiff was having difficulty managing his diabetes due to "cost constraints and his DOT status" (i.e., having a commercial driver's license which does not permit its holder to take certain medications). Plaintiff's physical examination was normal, his breathing even and unlabored. "This time diet restrictions were re-enforced. It is unknown if Lantus can be used under DOT license and he will research that. He declined use of Precose [treats diabetes] to help with post prandial sugars [after mealtime sugar]." Dr. Legg switched one of plaintiff's diabetes medications and told him to start taking Lisinopril.

March 15, 2010, is plaintiff's alleged onset date.

On March 16, 2010, plaintiff saw Dr. Legg for a follow up on his diabetes, and plaintiff reported he had been suffering with a "persistent cough over many years. He has a cough with near syncope [fainting]. . . . He has been off his Advair [treats asthma] for several months. He has been out of Ventolin [treats chronic obstructive pulmonary disease] also." (Tr. at 271). An examination showed normal breathing and clear lungs, but wheezing on inhalation. Plaintiff's glucose was 170 (Tr. at 270, 272). Dr. Legg prescribed Chantix (a medication to aid in smoking cessation) and told plaintiff to stop smoking and start using his Advair and Proventil.

Three days later, on March 19, 2010, plaintiff underwent a chest x-ray which revealed a right upper lobe opacity that was concerning for pneumonia (Tr. at 267). His heart was normal and his pulmonary vascularity (blood circulation in the lungs) was within normal limits.

---

[3]Lisinopril is a diuretic which traditionally treats high blood pressure; however, plaintiff had been prescribed this medication "for renal protection with his diabetes." (Tr. at 318).

On March 30, 2010, plaintiff had a chest CT that revealed a mass or collapse of the middle lobe of plaintiff's right lung and which ruled out pneumonia (Tr. at 265-266).

Plaintiff saw Dr. Legg on April 6, 2010, reporting worsening cough for about one year and shortness of breath for longer than that (Tr. at 263). Plaintiff reported that he had quit smoking; however, he had not filled his prescriptions for Chantix or Advair. He was using an old inhaler as needed. Plaintiff's physical examination was normal. His lungs were clear, his breathing was even and unlabored, and no wheezing was noted. Dr. Legg noted that plaintiff's CT scan and chest x-ray were indeterminate and he recommended a pulmonary evaluation. Plaintiff refused dietary therapy for his diabetes, and Dr. Legg recommended plaintiff continue with diabetes medications as prescribed.

Three days later, on April 9, 2010, plaintiff saw Mitchell Ahrens, M.D., at the Ferrell Duncan Clinic for advice and opinion on shortness of breath and abnormal CT scan (Tr. at 243-246, 259-262). His current medications were Metformin (for diabetes), Lisinopril (for renal protection with diabetes), and Glipizide (for diabetes). He weighed 312 pounds. Plaintiff's oxygen saturation[4] was 95 percent at rest. Plaintiff reported shortness of breath with any activity and a history of cough with near fainting for the past four to six months. Dr. Ahrens noted that plaintiff smoked two packs of cigarettes per day -- even though three days earlier he had told Dr. Legg that he had quit -- and Dr. Ahrens recommended that plaintiff quit smoking. Plaintiff's physical exam was normal. Spirometry[5] showed moderately reduced

---

[4]Red blood cells must carry sufficient oxygen through the arteries to all of the internal organs to maintain life. Normally, when red blood cells pass through the lungs, 95% to 100% of them are loaded, or "saturated," with oxygen to carry. If a patient has lung disease or other types of medical conditions, fewer of the red blood cells may be carrying their usual load of oxygen, and the oxygen saturation might be lower than 95%.

[5]Spirometry measures how much air you can inhale and exhale. Spirometry also measures how fast you can exhale.

forced vital capacity[6] (FVC) and no expiratory obstruction.

Dr. Ahrens ordered a follow-up chest CT, which was performed on April 16, 2010, and revealed findings of superior vena cava (SVC) syndrome[7] with extensive collaterals about the anterior chest (Tr. at 238-239). There were no abnormalities found in the left lung.

On May 4, 2010, plaintiff saw Dr. Ahrens for follow up (Tr. at 234-235). Dr. Ahrens noted that plaintiff's bronchoscopy was "fairly normal." Plaintiff reported a history of dyspnea for several years with mild exertion and significant episodes of coughing that resulted in "near-syncope at times" but no hemoptysis (coughing up blood). He denied any fatigue. Dr. Ahrens noted that the CT showed significant compression of plaintiff's SVC and right main pulmonary artery. Plaintiff continued to smoke two packs of cigarettes per day. Dr. Ahrens assessed right arteriovenous malformation, anterior mediastinal mass, and type II diabetes; and he noted that plaintiff was overweight. He ordered a positron emission tomography (PET) scan to determine the best area for biopsy of plaintiff's lung mass and pulmonary angiography to evaluate the pulmonary arteriovenous malformation.

On May 19, 2010, plaintiff underwent a PET/CT[8] scan which indicated that plaintiff's lung mass was benign and relatively stable (Tr. at 231-232). Plaintiff also underwent a right

---

[6] The amount of air which can be forcibly exhaled from the lungs after taking the deepest breath possible.

[7] SVC (superior vena cava) Syndrome is a set of symptoms that result when blood flow through the superior vena cava (the large blood vessel that returns blood from the upper body back to the heart) is blocked.

[8] A positron emission tomography (PET) scan is an imaging test that uses a radioactive substance called a tracer to look for disease in the body. Unlike magnetic resonance imaging (MRI) and computed tomography (CT), which reveal the structure of and blood flow to and from organs, a PET scan shows how organs and tissues are working. A PET scan requires a small amount of radioactive material (tracer). This tracer is given through a vein (IV). It travels through the blood and collects in organs and tissues. The tracer helps the radiologist see certain areas or diseases more clearly.

pulmonary angiography that revealed a complete occlusion and cutoff of the right upper lobe

pulmonary arterial branch with moderate (40%) stenosis (narrowing) of one of the segmental

right lower lobe branches supplying the lateral segments (Tr. at 226).

On June 10, 2010, plaintiff underwent a CT biopsy of his lung mass at Ferrell Duncan

Clinic, and he was noted to have areas of fibrosis[9] (Tr. at 218). The following day his blood

sugar was 125 (Tr. at 255).

On June 15, 2010, plaintiff was seen by Dr. Legg for his diabetes (Tr. at 252-252). Dr.

Legg noted that plaintiff seemed to be doing well overall with his sugars, and plaintiff reported

having been compliant with his diabetes medications.

On June 29, 2010, plaintiff saw Dr. Ahrens who noted plaintiff's history of SVC

syndrome with fibrosing mediastinitis with CT evidence of dense fibrous tissue and chronic

inflammation (Tr. at 286-287). Plaintiff's symptoms were "basically stable," with shortness of

breath on exertion under one block and occasional coughing spells with near syncope.

Plaintiff did not have wheezing or other symptoms and denied any fatigue or chest pain. Dr.

Ahrens stated that plaintiff would "never reliably have the functional status to return to his

previous occupation of driving trucks" because of "some risk" associated with his dyspnea and

coughing spells. He predicted that plaintiff's level of activity would not improve and that it

would be unlikely he could maintain a job with significant physical activity. Dr. Ahrens noted

that the best hope for plaintiff was to keep his condition stable, and he believed that any

_____

[9]Fibrosis is the formation of excess fibrous connective tissue in an organ or tissue in a
reparative or reactive process. This is as opposed to formation of fibrous tissue as a normal
constituent of an organ or tissue. Scarring is confluent fibrosis that obliterates the architecture
of the underlying organ or tissue. Pulmonary fibrosis harms the tissues deep in your lungs.
The air sacs in your lungs and their supporting structures become scarred and make your
lungs thick and stiff. That makes it hard for you to catch your breath, and your blood may not
get enough oxygen.

aggressive treatment (such as resection) had the potential to cause worsening symptoms due to scarring. He noted that pulmonary rehabilitation might improve plaintiff's functionality, but plaintiff did not want to pursue it. Although plaintiff complained of symptoms of sleep apnea, plaintiff did not want to have a sleep study done until his disability application was "settled."

On August 4, 2010, plaintiff saw William Berner, M.D., at Cox Occupational Medicine and Workers' Compensation Center for a disability evaluation (Tr. at 289-293). Plaintiff reported that he experienced shortness of breath on very mild or moderate exertion and could only perform physical activity for short periods of time. Plaintiff noted that he was able to do his prior job as a truck driver, because most of it involved sitting and driving, but stopped working due to the risk of fainting due to coughing spasms. Plaintiff reported that his symptoms had progressively worsened. He admitted to smoking one pack of cigarettes per day (although three months earlier he reported that he had been smoking two packs of cigarettes per day). Plaintiff weighed 313 pounds and had a slightly increased heart rate. Dr. Berner noted that plaintiff had varicose veins in his neck, shoulders, chest, and abdomen that plaintiff said had been present since his early twenties. Plaintiff's overhead reach was limited to about 75 percent of the normal arc. His physical exam was otherwise normal. Dr. Berner noted that plaintiff had been diagnosed with fibrosing mediastinitis and his "ability to perform any kind of employment would have to be limited to strictly sedentary activities" as a result. He noted that plaintiff's pulmonary specialists had indicated that his lung condition was permanent and "can be expected to worsen."

On September 27, 2010, plaintiff saw Kimberly McGinn-Perryman, a nurse in Dr. Legg's office, and reported that he was experiencing right shoulder pain (Tr. at 332-333). "He states the morning he woke up with the pain, he had been working on his father's car the night before." Plaintiff's physical exam was normal except Ms. McGinn-Perryman noted some

limitations in plaintiff's range of motion; however, plaintiff refused to perform abduction with external rotation or adduction with internal rotation. She ordered an MRI of plaintiff's shoulder and prescribed Ultracet (treats moderate to severe pain) and Skelaxin (muscle relaxer). She recommended plaintiff not lift, push or pull more than ten pounds. "Smoking cessation counseling: Discussed health risks of smoking and benefits of cessation. Advised to quit. Discussed nicotine patches and gum. Discussed risks and benefits of medications to assist cessation."

On October 7, 2010, Dr. Elissa Lewis, a State Agency medical consultant, found that plaintiff did not have a medically determinable mental impairment (Tr. at 296).

On October 14, 2010, plaintiff had x-rays of his shoulder which were normal (Tr. at 330).

On October 26, 2010, plaintiff had an MRI of his right shoulder which revealed no rotator cuff tear (Tr. at 328-329). He was prescribed Ultracet for the pain.

On December 9, 2010, plaintiff underwent a repeat CT of his chest at Ferrell Duncan Clinic, which showed the same mass in his lung, albeit slightly smaller (Tr. at 316-320). Plaintiff reported that he was still experiencing significant dyspnea on exertion and lots of coughing with near syncopal episodes and "occasionally a full syncopal event for a couple of seconds." Physical exam revealed diminished breath sounds but was otherwise normal. Dr. Ahrens discussed referring plaintiff to a vascular surgeon to be evaluated for stenting of the SVC. He noted that plaintiff's cough could be a medication side effect and thought cough suppressant medication may be an option.

On December 14, 2010, plaintiff saw Dr. Legg for a follow up on his hypertension and "metabolic status" (Tr. at 326). Plaintiff's blood sugars had been running between 125 and 200, and his cough had worsened. His physical exam was normal. Dr. Legg changed

12

plaintiff's medication to see if that would help his cough, and he noted that muscle relaxers were helping plaintiff's shoulder.

On December 20, 2010, plaintiff saw Robert Vorhies, M.D., at the Vascular Surgery Clinic at Ferrell Duncan (Tr. at 308-310). Dr. Vorhies noted plaintiff's history of chest mass compressing his vena cava and his episodes of near-syncope. He noted that plaintiff was smoking one pack of cigarettes per day. Plaintiff's physical exam was normal except for diminished lung fields and slightly labored respirations and distension of the jugular vein. Plaintiff was instructed to continue following up with Dr. Ahrens and Dr. Legg, and Dr. Vorhies stated he would look into scheduling a venogram[10] with possible stent.

On January 21, 2011, Dr. Vorhies provided a letter to plaintiff summarizing the findings of a venogram performed the week prior (Tr. at 339). Dr. Vorhies noted that plaintiff had a complete blockage of the vein above the heart that runs from the neck and right arm. He indicated that he was not able to clear the blockage during the procedure, but plaintiff had "plenty of vein blood returning to [his] heart" from his legs, and blood from the arms and head had "found a way around this blockage without terrible difficulty." Dr. Vorhies noted that surgery was an option, but that it would be invasive, would not ensure a permanent solution, and would likely lead to more aggressive invasion of scar tissue.

On March 17, 2011, plaintiff saw Dr. Ahrens for a follow-up visit (Tr. at 312-314). Dr. Ahrens noted that plaintiff's limitations were "purely physical" and he continued to have "intermittent coughing spells with near syncope at times." Plaintiff continued to smoke one pack of cigarettes per day. Dr. Ahrens assessed dyspnea, SVC syndrome, and mediastinitis, all

---

[10]A venogram is an x-ray test that takes pictures of blood flow through the veins in a certain area of the body. During a venogram, a special dye (contrast material) is put into the veins so they can be seen clearly on an x-ray picture. A venogram looks at the condition of the veins and the valves in the veins.

13

unchanged.  He prescribed cough suppressant medication.

On March 29, 2011, plaintiff saw Dr. Legg for evaluation of his diabetes, mood, and cholesterol (Tr. at 323).  Plaintiff was not "attempting any dietary therapy at all."  Plaintiff's physical exam was normal, and Dr. Legg assessed acute stress reaction; unchanged, uncontrolled diabetes; improved hyperlipidemia (high cholesterol); and fibrosing mediastinitis. He recommended dietary therapy and Trazodone as a sleep aide.

On May 2, 2011, Dr. Ahrens completed a Medical Source Statement - Physical (Tr. 336-337).  He found that plaintiff could lift less than five pounds, stand or walk for less than 15 minutes at a time, stand or walk for less than one hour per day, sit for one hour at a time, sit for one hour total per day, and was limited in his ability to push or pull because he "will develop significant dyspnea with continued activity."  He found that plaintiff could never climb, stoop, kneel, crouch, crawl, or be exposed to hazards or heights.  He wrote, "I do not believe he can perform the never actions consistent[ly] or repetitively."  He found that plaintiff could occasionally balance and that he could frequently reach, handle, finger, feel, see, speak and hear. He found that plaintiff should avoid moderate exposure to extreme cold or heat, dust and fumes, and that he should avoid concentrated exposure to weather, wetness, humidity, and vibration.  Plaintiff was not required to lie down or recline during the day, and his medication did not cause a decrease in concentration, persistence or pace.

On June 28, 2011, plaintiff saw Dr. Legg for a follow-up related to his diabetes (Tr. at 342).  Dr. Legg noted that Dr. Ahrens had prescribed Wellbutrin for depression and plaintiff was still having difficulties sleeping, even with Trazodone.  Plaintiff's physical exam was normal.  Dr. Legg assessed acute stress reaction and diabetes.  He increased plaintiff's Trazodone dosage and adjusted his diabetes medication.

14

C.    *SUMMARY OF TESTIMONY*

During the July 14, 2011, hearing, plaintiff testified as follows:

Plaintiff last worked as a truck driver, but while at that job he would have problems with his consciousness every once in a while (Tr. at 28). He would get light headed and shaky, and he "had another issue medically that took [him] back and put [him] out of work for another three months. Now that problem's[11] been solved." (Tr. at 28). Although he never blacked out while driving, he decided he better stop driving "when it was getting bad" (Tr. at 28).

Plaintiff now will start coughing and he will shake like he is convulsing and will eventually pass out (Tr. at 29). He has coughing fits up to four times a day (Tr. at 36). Extremes of temperature and humidity make it worse (Tr. at 36). He gets very dizzy, even walking across a room (Tr. at 29). Although he has not fallen yet, he loses his balance (Tr. at 29). "I usually go straight to the couch or a chair and sit down when that happens because I don't like eating floor" (Tr. at 29). Plaintiff is short of breath all the time (Tr. at 29). He will be short of breath without doing anything at all (Tr. at 30). He can walk 25 to 50 yards before needing to take a break (Tr. at 29-30). He has to stop at least one time, sometimes twice, when walking that far (Tr. at 30). When asked if he has problems standing in one spot, plaintiff said, "As long as I'm doing anything for any length of time, no. I mean if I'm doing it for more than five minutes my legs start getting tired and I start getting wore out." (Tr. at 30).

Plaintiff has passed out just sitting down (Tr. at 30). He can sit for an hour at a time (Tr. at 30). His girl friend drove him to the hearing from 62 miles away, and they did not stop

---

[11]Plaintiff never identified this other problem, but the ALJ surmised he was referring to this right shoulder (Tr. at 13).

Case 6:11-cv-03490-REL   Document 15   Filed 11/26/12   Page 15 of 30

on the way (Tr. at 35). If plaintiff goes up one flight of stairs, he is completely wiped out (Tr. at 33).

Plaintiff passes out up to three times per week (Tr. at 31). The longest time of being out was five minutes in a restaurant (Tr. at 31). But the other times he is not watching the clock so he does not know how long he is out (Tr. at 31). If he starts coughing, he is usually going to pass out (Tr. at 31).

Plaintiff feels tired all the time regardless of his sleep (Tr. at 34). He takes naps during the day because of that (Tr. at 34).

Plaintiff said there is no medication for his condition, but he does take medication for the symptoms (Tr. at 35). He takes Benzidine, Advair, Ventolin, and Ultracet (Tr. at 35). The Benzidine helps a lot with his coughing (Tr. at 35). The other medications help when he is in pain or feeling "kind of laggy" (Tr. at 35). Plaintiff's doctor said there is a surgery for his condition, but he does not recommend it at this time and there is only a 20% chance of success (Tr. at 30).

Plaintiff tries to do dishes when he can (Tr. at 32). It takes him about two hours when it should take about ten minutes (Tr. at 32). He has to stop so much when he is doing house cleaning that it takes him all day to do it (Tr. at 32). Plaintiff can no longer mow the yard or use a vacuum (Tr. at 32). "Really, most cleaning wears me out pretty bad, but I can usually muttle through it. But that's about all I can do is dishes and maybe, maybe mop the floor if I'm feeling quite up to it" (Tr. at 32). When asked about his hobbies, plaintiff said he sits around the house and reads books, and he said, "I try to keep busy when I have to keep busy" (Tr. at 32). Plaintiff lives in an apartment with his girl friend (Tr. at 33). He drives, but he tries to keep it local (Tr. at 34). "I don't do anything long distance because there's too much of a chance that I might not have as good luck with that as I do just keeping it in town." (Tr. at 34).

16

Plaintiff's doctor told him he could no longer work as a truck driver and also told him to limit his "regular driving a little bit" (Tr. at 34). He interpreted that as not driving anywhere that would take more than five or ten minutes to get to (Tr. at 34).

Plaintiff cannot do sedentary work because when he starts coughing, he convulses and then passes out (Tr. at 36). "I don't know how I would work if I'm throwing their product all over the floor" (Tr. at 36). Plaintiff passes out from his coughing fits two or three times a week (Tr. at 36). Sudden temperature changes affect him very badly, and if he tries to walk too fast, he will start "coughing his head off" after about 15 to 20 feet (Tr. at 37).

V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Robert Burbank entered his opinion on August 15, 2011 (Tr. at 10-19). The ALJ found that plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013 (Tr. at 12).

Step one. Plaintiff has not engaged in substantial gainful activity since March 15, 2010 (Tr. at 12).

Step two. Plaintiff suffers from fibrosing mediastinitis and obesity, severe impairments (Tr. at 12). The medical records show that plaintiff's diabetes is well controlled when he is compliant with medication, there is no evidence that this condition causes more than minimal limitations, and he did not allege diabetes as a disabling or contributing condition (Tr. at 13). Plaintiff's right shoulder problems were not alleged as a disabling or contributing condition, and the medical records establish that one shot in the shoulder resolved his symptoms (Tr. at 13).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13).

Step four. The ALJ found that plaintiff retains the residual functional capacity to perform the full range of sedentary work (Tr. at 13). With this residual functional capacity,

Case 6:11-cv-03490-REL   Document 15   Filed 11/26/12   Page 17 of 30

plaintiff is unable to perform his past relevant work as a truck driver (Tr. at 18).

Step five. Because plaintiff can perform all or substantially all of the exertional demands of sedentary work, he was found not disabled as directed by Medical-Vocational Rule 201.25.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible because the ALJ improperly relied on plaintiff's ability to do basic chores and read books during the day. He argues that he has a strong work record, and his treatment records are consistent with his testimony.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to

18

such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> A nuclear medicine PET/CT scan was . . . conducted in May 2010. . . .  All of the findings were thought to be most likely benign, inflammatory, or granulomatous in nature. . . .  The CT findings appeared to be relatively stable when compared to the prior diagnostic CT scan. . . .

> In June 2010, a CT biopsy was performed. . . .  Overall, it was noted to be an uneventful percutaneous biopsy . . . .

> During his late June 2010 pulmonary follow-up with Dr. Ahrens, the claimant's symptoms were noted to have been basically stable, with continued dyspnea upon exertion, which generally took two to three minutes to recover from. The claimant continued to report occasional coughing spells where he had near-syncope. He reported no wheezing or similar symptoms. . . .

> In December 2010, another chest CT scan was performed . . . .  The current CT scan revealed that [the mediastinal mass] now [was smaller]. . . .  Overall, the CT revealed a stable study.

> The claimant saw Dr. Ahrens for follow-up care in December 2010. The claimant was noted to have continued dyspnea upon exertion, as well as coughing spells that had led to near-syncopal episodes.  The claimant's coughing spells were noted to often times occur with exertion.  However, the claimant reported improvement in his breathing with the use of his prescribed Advair. . . .

19

. . . The claimant's medical condition is well documented in the evidence of record, which supports the fact that the claimant has some significant exertional limitations. However, these significant limitations would not prelude the claimant from being able to perform sedentary exertional-level work. The evidence supports that the claimant has occasional coughing spells, which resulted in near-syncope at times. The claimant alleges that he unpredictably passes out one to three times per week on average for up to five minutes at a time. However, the evidence of record generally notes that the claimant experiences only near-syncope on occasion as a result of his coughing spells. During the August 2010 examination with Dr. Berner, the claimant reported one instance where he had a coughing spell that lasted for several seconds, which after ending, resulting in the claimant fainting. Then, during a December 2010 visit with Dr. Ahrens, the claimant reported having occasional full syncopal events that would last for a couple of seconds. These are the only two instances within the evidence of record where the claimant was noted to have a full-syncopal event. This does not support the claimant's allegation of he unpredictably passes out one to three times per week. Additionally, the evidence shows that the claimant reported that the few full-syncopal events that he experienced last only a couple of seconds, as opposed to lasting up to five minutes as the claimant alleges. The claimant testified that he still drives locally, performs some housework, and spends his day reading. He testified that his prescribed medications provide significant relief of his coughing and pain. Overall, the evidence of record consistently demonstrates that although the claimant has some significant exertional limitations, he is capable of performing work at the sedentary exertional level.

(Tr. at 15-18).

Here, the ALJ properly considered inconsistencies between plaintiff's subjective allegations and the objective medical evidence. 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2); SSR 96-7p. Plaintiff testified that he had constant shortness of breath. However, physical examinations typically revealed normal breathing and clear lungs, with findings of diminished breath sounds and wheezing on just a few occasions. Plaintiff reported that he passed out one to three times per week due to coughing, yet treatment notes show that he reported his coughing led to "near syncope" rather than syncope, or passing out. Only twice did plaintiff tell physicians that he passed out due to coughing, and only one of those reports was to a treating physician as opposed to one seeing him in furtherance of an application for financial benefits. In August 2010, plaintiff was seen in connection with a worker's compensation claim and stated that "one time [before his alleged onset date] he got

Case 6:11-cv-03490-REL   Document 15   Filed 11/26/12   Page 20 of 30

into a coughing spasm where he could not stop for several seconds, and as soon as the coughing subsided, he fainted." The second report was made in December 2010 when plaintiff reported "a lot of trouble with cough and now pre-syncope, along with occasionally a full syncopal evident for a couple of seconds." This record also notes that plaintiff "continues to seek disability at this point."

The federal regulations state that although an ALJ may not reject a claimant's subjective complaints based solely on the objective medical evidence, such evidence is a useful indicator in making conclusions about the effect of symptoms on the claimant's ability to work. 20 C.F.R. §§ 404.1529(c) and 416.929(c). Moreover, the Eighth Circuit has held that the absence of an objective medical basis to support the degree of a claimant's subjective complaints is an important factor in evaluating the credibility of his testimony and complaints. Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002); Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991).

The ALJ noted that plaintiff's functional abilities in his daily activities were inconsistent with his subjective complaints. Plaintiff testified that he had constant shortness of breath and could stand no more than five minutes and sit no more than one hour continuously. Yet, plaintiff testified that he performed some housework, including washing dishes and mopping, and spent his days reading, watching television and movies, or playing video games. Medical records reflect that plaintiff was working on his father's car after his alleged onset date. In his administrative reports, plaintiff stated that he could shop for one to two hours at a time, which is wholly inconsistent with his testimony that he could stand for nor more than five minutes. In his administrative reports, he stated that he had no difficulty sitting --again wholly inconsistent with his testimony that he can sit for no more than an hour at a time. He reported that he could play video games on his computer for two hours at a time, which is inconsistent

Case 6:11-cv-03490-REL   Document 15   Filed 11/26/12   Page 21 of 30

with an inability to sit for more than one hour at a time. Plaintiff told his doctor that he was able to do his job as a truck driver because it was mostly sitting -- it was his coughing that interfered with his ability to drive a commercial vehicle. Again, this is inconsistent with plaintiff's testimony that he could not sit for more than one hour at a time. Plaintiff testified that he has to sleep during the day and at night due to fatigue; however, he repeatedly denied fatigue to his treating doctors.

Plaintiff reported that he had coughing episodes two to four times per day and usually passed out as a result of these episodes. However, he is able to go out alone, he drives locally, and he shop in stores. It is simply implausible that plaintiff would drive -- locally or otherwise -- if he passed out from coughing multiple times per day. "[A]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009)).

Plaintiff suggests in his brief that the ALJ did not give enough weight to his strong work history. Yet, he testified and reported in his administrative paperwork that he stopped working for a reason unrelated to the impairments which he now claims to be disabling, and he reported that he had lost a job in the past due to problems getting along with others. These are matters which support the ALJ's finding that plaintiff's complaints of disabling symptoms are not credible. Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) ("Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition."). Additionally, although plaintiff had substantial earnings during some years, I note that he had no earnings at all and only $9 in annual earnings during another year that was less than ten years prior to his alleged onset date, which suggests that plaintiff's failure to work now may be caused by something other than his impairments.

Finally, the record shows that medication significantly relieved plaintiff's symptoms. Plaintiff testified that he took medication for cough, diabetes, and pain and that these helped him. In June 2010 plaintiff reported that his blood sugars were responding to his diabetes medication, and Dr. Legg noted that plaintiff's blood sugars were "doing well." Dr. Legg noted in December 2010 that medication also helped plaintiff's shoulder. Despite the relief medications provided, plaintiff was frequently non-compliant. In March 2010 he admitted that he had not taken lung medications in several months. The following month plaintiff had not filled prescriptions for an inhaler and smoking cessation medications. He falsely told his doctor that he had quit smoking, but three days later admitted to another doctor that he was still smoking two packs of cigarettes per day. Indeed plaintiff continued to smoke at least one pack of cigarettes per day, against his physicians' advice, throughout the relevant time period. Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) ("there is no dispute that smoking has a direct impact on Mouser's pulmonary impairments"); 20 C.F.R. § 416.930(b). Further, in June 2010 Dr. Ahrens noted that plaintiff refused a referral to pulmonary rehabilitation, which Dr. Ahrens believed could improve plaintiff's functioning. "A failure to follow a recommended course of treatment also weighs against a claimant's credibility." Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (citing Gowell v. Apfel, 242 F.3d 793, 797 (8th Cir.2001)); see also Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) ("[A]n ALJ may properly consider the claimant's . . . failing to take prescription medications, seek treatment, and quit smoking.") (citations omitted).

Based on all of the above I find that the ALJ properly considered the Polaski factors in weighing plaintiff's credibility, and that he ALJ properly reached the conclusion that plaintiff's

subjective complaints of disabling symptoms are not credible. Therefore, plaintiff's motion for judgment on this basis will be denied.

## VII.    OPINION OF DR. MITCHELL AHRENS

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Ahrens that plaintiff could lift less than five pounds; stand for less than one hour each day; sit for one hour per day; and never climb, stoop, kneel, crouch or crawl.

The ALJ found that plaintiff can do the full range of sedentary work which involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a). As the ability to climb, stoop, kneel, crouch or crawl is not impacted by sedentary jobs, the only relevant part of Dr. Ahrens's opinion deals with plaintiff's ability to lift at least ten pounds occasionally and his ability to sit for most of the work day.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the

24

opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. §

404.1527(d)(2) - (5).

The ALJ had this to say about Dr. Ahrens:

In May 2011, Dr. Ahrens provided a medical source statement, where he opined that the claimant had numerous extreme exertional limitations, which included his opinion that the claimant would be unable to sit for more than one hour total during an eight-hour workday. Unfortunately, very little weight is given to Dr. Ahrens' opinions because they are not supported by his own treatment notes or the evidence of record as a whole. The evidence of record, including Dr. Ahrens' treatment notes, provides no supporting basis that the claimant would be unable to sit for more than one hour during an eight-hour workday. Dr. Ahrens' notes certainly support limitations on this claimant's ability to perform work involving significant physical exertion, but those notes do not reflect that the claimant is unable to engage in sedentary activities, which do not involve significant exertion. Additionally, those notes do not contain a recommendation that the claimant lie down for most of the work day to alleviate his symptoms. Although the claimant clearly has some significant exertional limitations based on the evidence of record, which have been taken into account in this analysis, the evidence does not support the extreme level of limitations opined by Dr. Ahrens in the medical source statement that he provided.

(Tr. at 17).

Clearly supportability by medical signs and laboratory findings and consistency of the

opinion with the record as a whole are the two relevant factors here, as Dr. Ahrens is a

pulmonary specialist who had a regular and ongoing treatment relationship with plaintiff.

The first and most obvious contradiction is plaintiff's assertion in his June 26, 2010,

Function Report that he has no difficulty sitting. This was completed by plaintiff less than a

year before Dr. Ahrens stated in the Medical Source Statement that plaintiff could sit for no

more than one hour per day. In July 2011 -- after Dr. Ahrens completed the Medical Source

Statement -- plaintiff testified that he sits around the house most of the day.

Reviewing Dr. Ahrens's medical records, I note that on the first visit, plaintiff's physical

exam was essentially normal and he reported shortness of breath with activity. There was no

mention or finding of a difficulty with lifting or sitting. The next visit reflects that plaintiff

25

denied fatigue and reported shortness of breath with mild exertion. Again, there was no complaint or finding of a difficulty lifting or sitting. The next visit shows that Dr. Ahrens found plaintiff's symptoms were stable. Plaintiff denied fatigue but reported shortness of breath on exertion. Dr. Ahrens noted that it was unlikely plaintiff could maintain a job with "significant physical activity." He did not mention anything about a lifting or sitting restriction. Also on that visit plaintiff refused pulmonary rehabilitation and a sleep study, deciding instead to wait on the outcome of his disability. The next visit with Dr. Ahrens reflects that all of plaintiff's symptoms were "unchanged." There simply is no basis whatsoever in Dr. Ahrens's medical records which would support a finding that plaintiff cannot lift even five pounds occasionally or that he cannot sit for more than one hour per day. Frankly, there is not even a halfway plausible argument that his medical records support such a restrictive finding, especially in light of plaintiff's own report that he has no difficulty sitting and that he spends his days sitting around his house. The only lifting restriction that appears in the records was in relation to plaintiff's shoulder condition which improved shortly thereafter, and the restriction was ten pounds -- the same as the restriction in the ALJ's residual functional capacity assessment.

Based on all of the above I find that the ALJ properly discounted the opinion of Dr. Ahrens as reflected in the Medical Source Statement.

## VIII. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity because the ALJ did not consider the effects of plaintiff's obesity or the impairments the ALJ found to be non-severe, i.e., diabetes and right shoulder problems.

The residual functional capacity is the most a claimant can do despite the combined effect of all credible limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The claimant

26

has the burden of proving the residual functional capacity. 20 C.F.R. §§ 404.1545(a)(3), 404.1512(c); 416.945(a)(3), and 416.912(c); Perkins v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012).

After analyzing plaintiff's credibility and considering the entire record, the ALJ properly determined plaintiff's residual functional capacity in accordance with the impairments and symptoms found credible. 20 C.F.R. §§ 404.1545 and 416.945; SSRs 96-7p, 96-8p. As required by agency regulations and Social Security Rulings, the ALJ properly "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including the medical opinion evidence. The ALJ determined that plaintiff had the residual functional capacity to perform a full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). Sedentary work involves mostly sitting, occasional walking and standing, lifting no more than ten pounds at a time, and occasionally lifting or carrying articles like docket files, ledgers, or small tools. 20 C.F.R. §§ 404.1567(a) and 416.967(a).

Social Security Ruling 96-8p requires that, after identifying an individual's functional limitations, his work-related abilities must be assessed on a function-by-function basis, including physical, mental, and other limitations. Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004). The Eighth Circuit has noted that a claimant's residual functional capacity is a determination based upon all the record evidence. Id.; Pearsall v. Massanari, 274 F.3d 1211, 1217-1218 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)); Dykes v. Apfel, 223 F.3d 865, 866-67 (8th Cir. 2000) (citations omitted). The residual functional capacity is not based only on "medical" evidence; rather an ALJ has the duty to formulate the residual functional capacity based on all the relevant, credible evidence of record. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("[t]he Commissioner must

27

determine a claimant's residual functional capacity based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of his limitations"); 20 C.F.R. §§ 404.1545(a)(3) and 416.945(a)(3); SSR 96-8p.

Plaintiff argues that the ALJ improperly accorded very little weight to the May 2011 opinion of plaintiff's treating physician, Dr. Ahrens. That argument was discussed above and is rejected here as well. Based on the entire record -- including, as the ALJ specifically noted, "[t]he effects of the claimant's obesity" (Tr. at 16) -- the ALJ determined that plaintiff had the residual functional capacity to perform sedentary work. This finding is supported by the record.

In April 2010 Dr. Ahrens noted that a physical exam was normal and plaintiff's oxygen saturation was 95 percent at rest, which is within the normal range. In December 2010, plaintiff's physical exam was normal but for diminished breath sounds. Diagnostic tests reflected fibrosing mediastinitis, but plaintiff's bronchoscopy was "fairly normal," and tests showed no problems with plaintiff's left lung. Treatment notes do not show that plaintiff's condition was worsening. A PET/CT scan in May 2010 indicated that plaintiff's lung mass was stable. In June 2010 Dr. Ahrens noted that plaintiff's dyspnea and coughing spells were also stable. A CT scan in December 2010 indicated that plaintiff's lung mass had decreased in size and his lungs were otherwise unchanged. In January 2011, Dr. Vorhies indicated that, while plaintiff's SVC was blocked, plaintiff's body had adapted such that he had plenty of vein blood returning to his heart from his legs and the blood returning from the head and arms had found a way around the blockage.

Dr. Ahrens noted in June 2010 that plaintiff could not perform a job that involved significant physical activity. However, as the ALJ noted, Dr. Ahrens's statement did not reflect

that plaintiff would be unable to perform sedentary work, which does not involve significant exertion. Dr. Ahrens's statement is also consistent with plaintiff's admission to Dr. Berner in August 2010 that he stopped working as a truck driver because of the risk of fainting due to coughing but was otherwise able to perform the job because it mostly involved sitting and driving.

The ALJ properly gave greater weight to the better-supported opinion of Dr. Berner. The ALJ found that unlike Dr. Ahrens's opinion, Dr. Berner's opinion was well-supported by his thorough examination of plaintiff and was consistent with the evidence in the record as a whole. Dr. Berner examined plaintiff, reviewed the medical records, and found that plaintiff would be limited to strictly sedentary activities. Plaintiff weighed 313 pounds and had a slightly increased heart rate, his overhead reach was limited to about 75 percent of the normal arc, and his physical exam was otherwise normal. Dr. Berner's opinion reflects his findings on exam and is consistent with the other evidence of record, as discussed above. The ALJ properly weighed the medical opinions of Dr. Ahrens and Dr. Berner in assessing plaintiff's residual functional capacity.

While plaintiff argues that the ALJ erred in not basing his residual functional capacity assessment on a medical opinion that "fully" addressed plaintiff's residual functional capacity, this argument is without merit. "[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians" in determining a claimant's residual functional capacity. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011).

Contrary to plaintiff's argument, the ALJ properly accounted for all of plaintiff's credible impairments -- severe or not -- in the residual functional capacity finding by limiting plaintiff to no more than sedentary work. The ALJ properly considered the record as a whole

29

in determining the limitations in plaintiff's residual functional capacity. In formulating plaintiff's residual functional capacity, the ALJ considered all of plaintiff's alleged symptoms and "the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a) and 416.929(a); SSR 96-4p; SSR 96-7p. The residual functional capacity assessment is supported by the objective medical evidence and other credible evidence of record. Therefore, plaintiff's motion for judgment on the ground that the ALJ improperly formulated the residual functional capacity will be denied.

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 26, 2012

30